Please be seated. Thank you. Please call the next case. 213-458 Maria Almanza v. Barber, I.C. Counsel, you may proceed. Good morning, counsel. My name is Raymond Simard, and I am appearing on behalf of Maria Almanza. This is a manifest weight case. The first issue is causal connection. I'm going to begin with the causal connection for the right shoulder condition. In this case, the facts are pretty short. The commission found that Ms. Almanza sustained an injury to her shoulders on April 9, 2011. They further found that there was a causal connection, quote, initially between the accident and the bilateral condition of ill-being. But the commission found that such causal connection ceased to exist on January 12, 2011, which was the date of the arbitration hearing. The most significant fact to consider is that there is no history, suggestion, or suggestion of any subsequent or intervening accident, sickness, injury, that would supersede the earlier finding of causal connection. The commission looked at the medical opinions and focused on two things. One is the treating doctor, Dr. Mehta, who was having trouble diagnosing what exactly was the problem with the right shoulder. He said, quote, it's difficult to tell exactly what the etiology of the pain, end quote. Under the assumption that it's the subacromial space, he wanted to perform a diagnostic and hopefully therapeutic injection there. The commission took that to believe that he had no idea as to what was going on with this case or with this woman's condition, even though he had been treating her for approximately one year. Can I ask a question? One of the things that I think is at the crux of the commission's decision, and they also hung their head on Dr. Levin, as I understand it, who opined that the claimant's condition of ill-being was not causally related. But didn't the commission basically find that the claimant's subjective complaints of continued pain after the surgery were basically not valid? I mean, isn't that sort of what they were saying? They didn't believe that she had this. After surgery, her pain should have been less and more mobility, and said she had more pain and worse mobility. Didn't they basically say, we don't believe that? In so many words? They said that to some extent. That was one of the reasons they cited. But getting specifically to Dr. Levin's opinion, I cited in my brief the Clark case, where another examining physician, Dr. David Spencer, did an examination, made all sorts of findings, but testified later in a deposition that the complaints were all spurious, that she's malingering. And this court, and the commission bought it and denied benefits. This court reversed the commission and said, let's not look at what he said. Let's look at what he found. Which follows the basic rule that any expert opinion is only as good as the facts underlying it. What did Levin find? He found a successful operation, didn't he? Dr. Levin examined her for the second time in September of 2011. Successful operation, you ask? He assessed the two major ranges of motion in the shoulder. Flexion, she was at 90 degrees. She should be at 180. Abduction, she's at 90 degrees. She should be at 180. A competent shoulder examination should include tests for stability of the shoulder. Dr. Metta, who examined her about five and a half weeks earlier, found a positive near test, which is a test for rotator cuff impingement, and he found a positive Hawkins test. Dr. Levin didn't do a Hawkins. He didn't do a near. He didn't do a Jobe's, empty cans, speed, Jorgensen. You could run down the whole line. He just does nothing. My point in my brief is that his conclusion is like Dr. Spencer's conclusion in the Clark case. He can say it, but he can't prove it because his own examination betrays his conclusion. And in the Clark case, the court also stated that not only did Spencer's own conclusion betray his own findings, it was contrary to all of the evidence in this case. And what is all the evidence in this case? It's Dr. Metta's opinion. And then you have the opinion of Dr. Phillip, who reviewed the post, who's the radiologist who reviewed the post-surgical MRI where he found a 30 percent infrastructure tear in the supraspinatus tendon and a severe tendinitis. Did anyone else weigh in on the propriety of this increasing pain and decreasing mobility after what was ostensibly a successful operation? Did any other physician weigh in on those things, somewhat contrary to logic? This was Dr. Nolte. The only medical opinions are Dr. Metta and Dr. O'Leary. Dr. Metta could find no objective manifestation, no objective basis for the manifestation of the pain she claimed in her right shoulder. Is that not correct? He was uncertain. He could not tell exactly where he was coming from, where it was coming from. So it is difficult to tell exactly what the ideology of this pain is. Yes, and that's why you do diagnostic testing. If a doctor had a problem understanding where this lady's or this person's back pain was coming from, he would order an MRI. I think we're getting it backwards, or the commission did. You do the test to find out what something is. You do the test because you don't know what it is. I agree. Dr. Metta did not know exactly what was causing her pain. But she's had pain since the accident. That chain of causal connection has not been broken. And that would make sense. But, Metta, I think you could make the construction arguing that it supports Levin and supports the commission. Because, yes, you had the accident, you had the pain. Then you have, again, an ostensibly successful operation, and yet she's getting worse, more pain than ever before, less mobility than ever before. And none of these doctors can find, you know, perhaps where your test would be in order, any objective basis for this increasing pain, correct? Not necessarily. Does anybody point to a possible cause, post-operative cause of the increase in pain? Well, there are the MRI findings, and there are the objective findings. Dr. Levin's own objective findings. If she had a successful operation, she wouldn't have half her range of motion gone, inflection and abduction. She wouldn't have on a post-surgical MRI a 30 percent infrastructure tear in the supraspinatus tendon. She wouldn't have severe tendonitis. I don't think the first operation was very successful. It was performed by another physician who left the practice. Was there any evidence of that? We're survising any evidence, objectively, that the operation was not successful? I don't know. I think the findings, we're talking objective findings. This is strictly not all subjective, she's complaining, she's complaining. You have objective findings made by both doctors. So, again, let me ask you this. What objective findings? What objective? What objective findings made by the doctors? Well, Dr. Levin, in his second, his post-surgical, yeah, post-surgical examination, found a 90 degrees loss of, inflection was limited to 90 degrees, abduction was at 90. But that is largely subjective, because the patient only raises their arm as far as they want to raise it. The patient controls how far they lift their arm, don't they? This is not something that you can look at, give somebody a test, and determine whether they can really raise their arm more than 90 degrees. You ask them to raise their arms, they say this is as far as I can go. And that's the end of it. All right. But there were a number of other, even if that were correct, there were a number of other tests which he did not perform, such as the NEAR and the Hawkins, which Dr. Mehta performed five weeks earlier and were positive. And the MRI pictures don't lie. I mean, they say what they say. The radiologists found a 30 percent tear in the supraspinatus and severe tendinosis in the shoulder. What do you do if the commission doesn't believe the claimant's testimony? What do you do in the case if the commission believes that the claimant's malingering? What do you do on appeal with that? You look for something in the record that proves that the claimant is malingering. Everything the commission says has to have a sufficient basis in the record. That's the test that all of the cases have established. Here, there is no sufficient basis. Dr. Levine's opinion is inherently unreliable because it is contradicted by all of his objective findings or his lack to do testing. Did you try this? Yes. So you made the same argument before you ever turned to the commission, correct, I assume? Yes. And the circuit court. The MRI that you're speaking of, are you talking about the MRI that was administered in October of 1920? No, that was, I believe, the pre-op MRI. Okay. I'm going to move on because of the time limitations. The other issue that I wanted to raise, the commission denied the prospective care for two reasons. First, Dr. Mehta didn't really know what was going on. We've covered that. And the second is that on cross-examination, counsel did not try this case, they asked the claimant, don't you have group insurance to pay for this? And the commission specifically cited in its decision that the claimant did not have treatment under her group insurance, so therefore she must not really be in that much pain. That's what they said. Well, of course, such finding is contrary to the underlying philosophy of the act, that casualties of industry should be borne by industry. And this court specifically said in plantation manufacturing that a claimant's ability to pay is not relevant to an employee's obligation under Section 8A. All right, so assuming we have a violation here, it's an evidentiary ruling, it's an abuse of discretion, the next test becomes was the petitioner prejudiced by this? And I say yes. When they specifically cite that as one of the two bases for denying prospective care, the petitioner has been prejudiced. Finally, Dr. Levin opined that the petitioner was at maximum medical improvement for the other shoulder, the left shoulder, which begs the question, how can someone be at MMI for a condition for which they've never had any treatment? Dr. Levin examined her for the first time prior to the right shoulder surgery, the one in 2010, finds decreased range of motion, looked at the MRI, said there's tendinopathy, she may need physical therapy and an injection prior to surgery. The treating doctors concentrate on the right shoulder. He reexamines the left shoulder 11 months later, gets essentially the same results, but says she's at MMI, doesn't need any treatment. Getting back to the Clark case, that's his conclusion, but where is the basis in the record? His own opinion, he contradicts his own opinion. This is no different from Dr. Spencer who called the complaints spurious and malingering in the Clark case. I would ask that you reverse the commission's findings on the issue of causal connection and remand the matter with direction that they commission, enter an award authorizing the injection into the right shoulder that Dr. Mehta wanted to perform. Thank you. Thank you, counsel. Counsel, you may respond. Would you address Dr. Levine or Levin's testimony given opposing counsel's description that it couldn't have been a successful operation given the movement of the arm and shoulder afterwards? Sure, absolutely, Your Honor. First of all, may it please the Court, my name is Jeff Powell and I represent Armour-Eckridge in this case, opposing counsel. With regard to your direction, Your Honor, the IME report that opposing counsel is referring to is response exhibit number three, which is the IME report dated September 13, 2011. While opposing counsel is correct that the active range of motion was 90 degrees and 80 degrees, what opposing counsel doesn't mention is that in the supine position at the passive range of motion, which would be the doctor moving the shoulder itself, actually got it up to 170 bilaterally. Therefore, as Justice said earlier, when you're asked to raise your shoulder, you say that you can only raise it up here. But when you actually have somebody manipulating shoulder and it moves a little bit further, that is a test that Dr. Levine performed. So you would say that's an objective test that would support a conclusion of a successful surgery? I would argue that that would be one of the factors that is objective that Dr. Levine, I guess, relied his opinion upon when making his opinions that it was a successful surgery, that she was at MMI as of September 13, 2011, that she had the ability to return to work. And in his opinion, he notes that really the only thing holding her back from returning to work is her mentality that she can't do what she used to do due to her, I guess, the pain that she alleged that she was in. Did this woman have a post-operative MRI? She did, Your Honor. And what was the date of the MRI? The date of that, I believe off the top of my head, and I'll check for you here, but I believe it was July 5th, 2011, or July 20th, 2011, excuse me. So that was the post-arthrogram MRI of her right shoulder. What did that show? That showed severe tendonitis. While it did note that there was a linear intrasubstance tear of 30%, the radiologist did note that it does not communicate with the superior or inferior surfaces of the tendon at this level. So even after reviewing that MR arthrogram that was performed on July 20th, 2011, Dr. Mehta, on August 4th, 2011, was able to examine Petitioner, our employee again, reviewed the MR arthrogram and still noted that he had no idea where this pain was coming from, and that's when he suggests that we simply open up Petitioner's arm to try to figure out where the pain is coming from. So as the record now stands, is your position there is no objective evidence to explain the increasing pain and less mobility? Is that correct? That's correct. That's our position at this point in time, Your Honor. When taking, I guess, into account everything that occurred throughout this process, and I won't hammer into detail because I think it's kind of been mentioned so far, with all the different testing, with all the examinations, things along those lines, I think when you look at the two opinions, you look at Dr. Levin's opinions and also Dr. Mehta's, you look at Dr. Mehta of August 4th, 2011, he performs an examination of the employee. He looks at her MR arthrogram post-op. He even reviews the operative report that only showed the 20 percent tear, and basically says, I can't tell where the pain is coming from. You add in the additional factor of Dr. Levin's examination and his opinion, saying that she can go back to work as of September 13th, 2011. She's at MMI with regard to both shoulders. Opposing counsel in his argument noted whether or not it was an abuse of discretion to include the group health insurance. If you actually look at the case that he cited to, I think the case that he cited to actually states, and the issue there was whether or not the respondent would have to pay for medical expenses, knowing that an employee had group health insurance. I believe the respondent's argument in that case was, since she has group health insurance, we don't have to pay for it, she can just put it through that. Whereas in this case, it was more used along the lines of whether or not she required further surgery. By just looking at that factor as to whether or not she received any further medical treatment between the time that she last saw Dr. Mehta and the time of trial, which was approximately four, four and a half months. So in sum, without trying to hammer home all the points, you know, it is the respondent's position, our employer's position, that there is enough sufficient factual evidence contained within the records regarding the medical records itself, and also the opinions contained within, that the Commission's decision with regard to the issues in this claim is not against the manifest way of the evidence. Thank you, counsel. Counsel, you may reply. First, addressing the issue of whether there's group insurance available. That is not relevant. The act specifically says that the casualties of industry should be borne by industry. What's next? Couldn't you submit these expenses to Medicare if you have a petitioner who's over 65 years old? And getting back to the right shoulder, counsel just told you the MRI showed severe tendinitis. That does not sound like the first surgery was a success. And how about the left shoulder? What happened to all those findings in October of 2010 that suddenly disappeared in September of 2011 with the same examination? Dr. Levine totally flip-flopped on his treatment recommendations without any excuse or reason or sufficient basis. Thank you. I have a question for you, counsel. You hit this business about group health insurance. Why did the arbitrator mention group health insurance? I don't know. He said why he did. He said why he did because he said the petitioner never sought additional treatment while she was capable of getting it under her group health insurance without regard to workers' compensation. That's what he said. I'll read it to you. Petitioner had the ability to treat under group health insurance while the causal relations disputes continued regarding worker compensation. She did not seek any additional treatment but testified that she was in a lot of pain. He used that as a basis for suggesting she wasn't telling the truth. I ñ well, that's perhaps. But if in my ñ the witness who brought that up, it was Respondent's Witness Klages. Her name was the safety director. I asked her, are there deductibles and copayments to be made under the group plan? And she said yes. So perhaps the arbitrator saw the availability of group insurance as an attack on her credibility. I didn't see it that way. I mean, I just read it to you. It occurs to me that if a person testifies, I couldn't get medical treatment because they wouldn't authorize it under workers' compensation. Then I think it's fair game for the cross-examiner to turn around and say, ma'am, don't you have group health insurance? You could have gotten this on her. But you didn't get the treatment. And that goes to the question of you really needed the treatment. If I'm sick, I'm going to get that treatment regardless of who's paying for it. I'll worry about where the liability lies later. But that's human nature. And that's the only reason why they mentioned it. They didn't suggest that she couldn't collect because she had group health insurance. That simply isn't here. You say on the cross you asked, are there deductibles? Yes. Well, implicitly you saw it as an attack on, a way of blunting that direction of that question. Absolutely. My client works in a ministry. Well, I mean, that's why you asked the question. Yeah, of course. And Justice Hoffman's suggesting that that whole issue is used to direct that credibility primarily. If you are in such severe pain, you have an opportunity to get relief. But then you rebutted it by saying, yeah, but it's expensive to get that opportunity. Yes. No question. That's the purpose of your cross-examination. You want to turn around and say, sure, I could have gotten my treatment at a group health insurance, but I couldn't afford to pay the deductible. I mean, that's your defense to the attack that she's not telling the truth because she could have gotten treatment. That's exactly my point. But this isn't the situation. You represented your original argument that they somehow decided that she wasn't entitled to something because she had group health insurance. Well, that's nothing could be further from the truth in this opinion. I'm sorry. I beg to differ. I think perhaps my opponent was making the arbitrator aware that group insurance was available, giving the arbitrator a fallback position if he was deciding whether or not to authorize the surgery. I don't think a collateral source is relevant when the obligation to pay for injured workers falls to the employer. I agree with you there. But it is relevant to whether they're telling the truth as to why they didn't get treatment. Then it becomes relevant. I'm sorry. I'm going to have to do it. Okay. Very good. Thank you. Thank you, counsel, both. This matter will be taken under advisement. A written disposition shall issue.